## BARRAS *v.* BARRAS.

1. DEEDS—DESTROYED INSTRUMENTS—BURDEN OF PROOF.
    Where complainant alleged the making of a deed from
    his mother to his father, which was destroyed after the
    father's death, the burden of proving the making of a
    valid deed is upon complainant.

2. SAME—VOID DEED—DELIVERY—BLANK DEED.
    A printed blank conveyance, with neither grantor, grantee,
    conveyance, nor description, containing in writing only the
    signature of the grantor, is an absolute nullity and cannot
    be given life even where the grantor gave the grantee oral
    authority to fill it in.

3. SAME—DESTROYED DOCUMENT—CONTENTS—PRESUMPTIONS.
    The presumption that the contents of a deed destroyed by
    defendants were as alleged by complainant has no appli-

cation where its contents are established by positive testimony.

4. SAME—HUSBAND AND WIFE—AGENCY—OWNER.

Evidence that the husband dealt with the lands for ten years after the giving of the alleged deed as agent for his wife, *held*, to negative the allegation that he claimed to be the legal owner.

5. TRUSTS—DEEDS—CONSIDERATION—STATUTE.

Where the husband paid the consideration for the land, and title was taken in the name of the wife, no trust in favor of the husband can result. 3 Comp. Laws, § 8835; 3 Comp. Laws 1915, § 11571.

Appeal from Iron; Flannigan, J. Submitted April 18, 1916. (Docket No. 22.) Decided June 1, 1916.

Bill by Alpha C. Barras against Frances E. Barras and others to establish a deed, for an accounting, and for other relief. From a decree for defendants, complainant appeals. Affirmed.

*John Power* (*A. H. Ryall,* of counsel), for complainant.

*N. C. Spencer* (*F. A. Bell,* of counsel), for defendants.

The plaintiff in this case is the son of defendant Frances E. Barras and a brother of John H. Barras and Sarah J. Barras. The bill charges that complainant's father, Edwin P. Barras, died intestate in the year 1901; that at the time of his death he was seised of certain real estate interests in Iron county; further, that the title to said real estate was taken in the name of his wife, defendant Frances E. Barras. It is next charged that in the fall of 1891 the defendant Frances E. Barras, for a good and sufficient consideration, conveyed all of said real estate and real estate interests by quitclaim deed, duly executed, witnessed, and de-

livered, to said Edwin P. Barras, which deed remained in the possession and under the control of said Edwin P. Barras up to the time of his death. It is further charged that within 30 days after the death of said Edwin P. Barras the defendant Frances E. Barras, his widow, on going through the papers of her deceased husband, discovered said quitclaim deed and destroyed it, and that thereafter said defendant claimed to be the legal and equitable owner of all the real estate and real estate interests described in said deed. The bill further charges upon information and belief that the other defendants, John H. Barras and Sarah J. Barras, were cognizant of the destruction of said deed, and that they are now participating in the profits, earnings, rents, and royalties collected from said real estate and real estate interests with their mother, defendant Frances E. Barras. It is further charged that, the consideration for the purchase of said lands and interests in lands having been furnished by said Edwin P. Barras and the title thereto taken in the name of Frances E. Barras without consideration moving from her, she thereupon became and was trustee for the estate of Edwin P. Barras and his heirs. The bill prays that the real estate in question be decreed to be a part of the estate of Edwin P. Barras, deceased, and the property of his heirs in the proportion provided by law; *second,* that it be decreed that said defendant Frances E. Barras now holds title to said real estate and real estate interests and said money in trust for the estate of Edwin P. Barras; *third,* for an accounting. The defendants filed a joint and several answer denying all the material allegations of the bill. Upon the hearing the complainant placed his mother, Frances E. Barras, upon the stand and examined her under the statute. With reference to the deed in question she gave the following testimony:

"*A.* Well, a few years ago Mr. Barras drew up a blank and got me to sign a blank, and he said I would be going into the city and riding after fast horses, and said it didn't amount to anything; that I could destroy it at any time; that I could destroy it as soon as I returned home; but if anything happened to me, he wouldn't have a dollar. That happened just before I went to Chicago. The children were small at the time. I don't just remember the year. I signed it and I put it in the trunk; in the Barras trunk where we kept our papers jointly. I read it over. There wasn't anything to read over; just the blank, no figures or any writing on it at all. He wanted to protect himself. I know what became of that paper. I burned it; there was nothing on it. I burned it the year Mr. Barras died. When I told Alpha of it he threatened me; he made my life unhappy just through burning that blank. I did not show him the blank before I burned it. Sadie saw it. John was the first one who saw it in the trunk. He said: 'Mother, you had better destroy it. It don't amount to anything.' And my daughter, she says, 'Let me see it.' She took it and read it and looked it all over carefully; there was nothing on it except my signature, and she says: 'You can destroy it. It don't amount to anything.' I did not show it to Alpha; he was not there.

"*Q.* A few minutes ago I understood you to say that all the children were there when you first looked these over?

"*A.* They were, but that was not found. My son John looked through the trunk. That was just after my husband's death. I don't remember if that was after or before I got the letter from Mrs. Ross.

"*Q.* Just tell us again what your husband said the paper was when he signed it.

"*A.* The blank?

"*Q.* The blank, or whatever it was.

"*A.* Why, he said I was going into the city and would be driving after fast horses, and if I would be killed, then he wouldn't have anything to show; he wouldn't have a dollar.

"*Q.* It was intended to be filled out with descriptions of the land you speak of?

"*A.* Well, I suppose—

"*Q.* Do you remember about the age of the children?

"*A.* My youngest daughter was a little girl; yes. There were no witnesses to this paper at all. He had been in the habit of writing out his own deeds. I think he had frequently wrote out the whole deed in longhand. He was capable of drawing a legal instrument.

"*Q.* Do you remember what kind of a sheet of paper that was?   *   *   *

"*A.* I think they call it legal cap. It was single length. Shortly after signing that, I went to Chicago or somewhere to visit. I left the paper with Mr. Barras.

"*Q.* Can you tell us how much money you paid for any of these lands?

"*A.* Well, I did a man's work in the post office; I had a position there, and saved in various ways. I think the total amount was about $400, $300 or $400. When these lands were given to me there wasn't any talk as to what was to be done with these lands upon Mr. Barras' death. He wanted me to have them; he gave them to me. He never said a word about how the children should share. I worked in the post office 3 years during Cleveland's first administration. Mr. Barras had located quite a few lands before that. I can't tell now which of these particular descriptions; it is so long ago, Mr. Barras died in August, 1901.

"*Q.* Can you tell us now any closer than you have as to the date you burned this piece of paper with your name on it?

"*A.* It was after we looked all through the trunk, and John went back afterwards to the trunk and found it; I knew it was there, but he found it. I intended to destroy it, but I neglected. Mr. Barras said I could burn it right after I came back, but I neglected it, and John found it there. I think that was about three or four weeks after his death; perhaps it might not have been so long as that; I can't remember exactly."

Defendant Sarah J. Barras, also examined under the statute, corroborated the evidence of her mother as to the finding and destruction of the paper. She described the paper as follows:

"There was nothing to read on the paper that was destroyed. It was nothing but a blank, a blank form of deed, no writing at all. No descriptions in it, or any writing, just her signature. There were no witnesses to it, nor any acknowledgment. I suppose it was in among the other papers. I don't know where my brother found it. It was in the trunk. I didn't see it when he found it in the trunk."

Defendant John H. Barras, called by complainant, testified in part as follows:

"I was present at the time after father's death and at the time mother and my sister looked over these papers in the trunk. We did not find the blank that mother had signed until about a week after, or such a matter. I was looking through the papers to see if there was anything in the bottom of the trunk or what would be of any value, and I ran across this; and I knew that if it got into an outsider's hands they might fill it out and make a little trouble, and I told her she had better burn it up; that she should not leave such things around. It was just a blank deed. I don't remember whether it was a quitclaim deed or a warranty deed. It had no date on it, or any witnesses on its, no acknowledgment on it, just mother's signature at the bottom, no other signatures at all. It was signed with mother's name, 'Frances E. Barras.' I recognized her handwriting. I had never heard of that deed before that time; I had never heard father mention it; had never heard of it talked about in the family. I did not know of its existence at all. I told mother to destroy it. She destroyed it; my sister saw her do it."

The complainant's version of the making of the deed and its contents follows:

"I remember of the execution of this paper that mother referred to, that she signed just before going away. * * * It occurred when I was about 18 years old.

"A. Mother was going away on a trip, and my father told her that he wanted her to sign the lands over to him, because if anything happened to her there might be trouble. His reason as to why he wanted

her to sign was because she was going away and going to take some risk. As to where the property would go if she should die, he said that if mother should be killed, he would have trouble in getting it, because it was in her name, and he wanted her to deed it to him. He made out the paper, on the kitchen table. I know that my father was a practical scrivener. He had been county clerk prior to that time; he made out all his legal papers. He always took the description from his head. He made out the tax receipts—  *  *  * Well he made out the deed, and she signed it, and I signed it as a witness. After he died at Escanaba, my memory—I never thought anything more about it, until after he died, and I saw a letter from Mrs. John D. Ross in the kitchen. I was interested in family matters, and I picked it up and read it, and she said, 'Burn the deeds.' I remember that well; than I thought of this. I remembered the circumstances of her deeding to him, and immediately it occurred to me that it must have been that deed. So I accused mother, and she said she had, but when I told her it wasn't right, she says: 'What do you care? You will get it anyway. I talked with her about this frequently. She admitted that she burned the deed. I talked with her about the contents of the deed. She knew that it covered these lands, and I did, too, in Iron county. I knew it covered these lands because he located those lands, and the other is—I thought those are the ones he was trying to have her deed to him at that time. I never heard of mother claiming that this was only a blank paper she signed before; that is, not until some time after, from something they had said about it. Prior to that time I had heard nothing about it.  *  *  * When this deed was signed by my mother—he always kept his papers in the trunk upstairs. I don't know where he kept this; I never saw it, but all his valuable papers were kept there. After mother signed the paper she gave it to him. It was put away the next day, as I remember it. As I remember, she went away. I think that was the evening of the day before she left. There was no such talk as mother says about her coming back. The deed was to be destroyed, when I was there."

On cross-examination, complainant testified:

"I cannot say now from memory the descriptions that were in that deed that mother signed before she went to Chicago. I couldn't tell the descriptions any more than from the conversations they had. Father wrote in some lands that stood in mother's name. I don't know that; I only signed as a witness. I know of some descriptions in this deed; I could see that. I wouldn't remember which ones. Of the understanding there was between father and mother at the time she left, I only know as I heard their talk in the kitchen that night. That is all. As to an understanding that the instrument was to be of no effect whatever, if mother came back alive, I know nothing."

The record clearly shows that this transaction, whatever it was, occurred about the year 1891, and that Edwin P. Barras lived about 10 years thereafter. Various letters, leases, and options affecting the lands in question, or some of them, were introduced in evidence. These were all dated subsequent to the making of the alleged deed, and all were signed by defendant Frances E. Barras in person, or by Edwin P. Barras, as agent for her. Some correspondence was introduced between Edwin P. Barras and his son, the complainant, with reference to these lands, dated only a few months before the death of Edwin P. Barras. In one of these letters the writer referred to some of the lands in question as "my lands at Iron River," and in others expressions are found indicating that Edwin P. Barras was exercising control over the interests, the legal title to which stood in the name of his wife, Frances E. Barras.

The learned circuit judge who saw the witnesses upon the stand and heard them give their testimony, filed an opinion which concludes as follows:

"John and Sarah, who were equally interested with the complainant, and who would profit equally with him if a deed from their mother to their father was established, both testified positively that the paper which the mother, at their suggestion, destroyed was a blank form of deed, with no writing whatever on it

but the mother's signature. But, to accept as truthful the mother's statement that the paper she signed and destroyed was a mere blank, and was not the instrument claimed by the complainant, recourse to the corroborating testimony of John and Sarah, or to the many corroborating circumstances furnished by the testimony, is wholly unnecessary. It may be said of Mrs. Barras, if it may be said of any witness, that her appearance and manner on the witness stand made disbelief of her testimony impossible. On the other hand, the testimony of the son, who has asked the court to find that his mother, who, throughout his early life worked in the home and outside the home, that he might be comfortable and educated, and who gave him a mother's love in abundance, deliberately destroyed a deed with the fraudulent and criminal purpose of defeating him out of an inheritance, and to further find she endeavored to make her alleged fraudulent act effective by perjury, is wholly discredited.

"A decree will be entered dismissing the bill of complant, with costs of the defendants to be taxed."

BROOKE, J. (*after stating the facts*). The burden of proof in this cause is, of course, upon the plaintiff. Opposed to his testimony as to the contents of the paper which was destroyed is that of his mother, brother, and sister. Assuming the witnesses to be of equal credibility, it is plain that plaintiff has failed to establish his claim by a preponderance of the testimony. The learned circuit judge who saw and heard the witnesses was convinced by their manner and deportment that the defendants' version of the matter was entitled to credence. Under such circumstances we have said:

"Much weight should ordinarily be given to the conclusion reached by the trial judge, who has had the opportunity of seeing and hearing the witnesses." *Grand Lodge A. O. U. W.* v. *Brown,* 160 Mich. 437 (125 N. W. 400).

It is asserted by counsel for appellant that the destruction of documentary evidence, which in this case is admitted, raises a presumption that its contents were what is alleged by the other party. To this proposition appellant cites 1 Jones on Evidence, § 18, and 1 Wigmore on Evidence, § 291, and various authorities from other States. The trouble with the proposition advanced by appellant is not with the principle, but with its application to the facts in the case under consideration. If the evidence introduced on behalf of defendants is believed—and it was believed by the learned circuit judge—then the paper destroyed was an absolute nullity, a printed blank conveyance with neither grantor, grantee, consideration, nor description, containing in writing only the signature of defendant Frances E. Barras. Such a paper could not legally have been given life by Edwin P. Barras, even if Mrs. Frances E. Barras gave him oral authority to fill it in. *Newton* v. *McKay*, 29 Mich. 1; *Lindsley* v. *Lamb*, 34 Mich. 509; and *Maynard* v. *Davis*, 127 Mich. 571 (86 N. W. 1051).

According to the testimony of defendant Frances E. Barras it was agreed between her and her husband that the instrument, whatever it was, should or might be destroyed by her upon her return from Chicago. This testimony is not controverted, although complainant gave evidence to the effect that he heard no such agreement between his father and mother at the time the paper was signed.

It is urged on behalf of appellant that the course of dealing indulged in by Edwin P. Barras with reference to the lands in question as evidenced by his correspondence is convincing proof of the fact that he claimed to be the beneficial owner thereof, and exercised an owner's dominion thereof. An examination of the entire record upon this point convinces us that Edwin P. Barras dealt with the lands after 1891

entirely as agent for his wife and for Mr. Ross, his brother-in-law, who owned an undivided interest in the same. During the 10 years which elapsed between the time when the paper was signed by his wife and his death, Edwin P. Barras doubtless could have secured from his wife a valid conveyance of said lands. He appears, however, to have been content to permit the legal title to rest in his wife, where it had been for upwards of a quarter of a century.

The lands and interests therein involved in this cause appear to have been purchased with money furnished in part by Mr. Ross, a brother-in-law of Edwin P. Barras, and in a small part with money furnished by defendant Frances E. Barras. The lands were selected by Edwin P. Barras, and for his services an undivided interest was, at his request, deeded to his wife. defendant Frances E. Barras. Under such circumstances the consideration having been paid by him, and the title taken in her, no trust can result. The statute (section 8835, 3 Comp. Laws [3 Comp. Laws. 1915, § 11571]) forbids it. See, also, *Barnes* v. *Munro*, 95 Mich. 612 (55 N. W. 431); *Winans* v. *Winans' Estate*, 99 Mich. 74 (57 N. W. 1088); *Wipfler* v. *Wipfler*, 153 Mich. 18 (116 N. W. 544, 16 L. R. A. [N. S.] 941).

The decree will stand affirmed, with costs to appellees.

STONE, C. J., and KUHN, OSTRANDER, MOORE, STEERE, and PERSON, JJ., concurred. BIRD, J., did not sit.