ARIEL BARTH, *Plaintiff*, v. FRANK J. BARTH, *Respondent*, A. M. MEDALEN *et al., Appellants.*[1]

[1]Reported in 143 P. (2d) 542

*Little, Burgunder & Smith,* for appellants.

*B. Gray Warner,* for respondent.

STEINERT, J.—Plaintiff commenced an action against the defendant for divorce and for the confirmation of an alleged property settlement made between herself and her husband. Two days after the commencement of the action the defendant husband was adjudged insane, and about two months later a guardian was appointed for his person and property. The guardian, after obtaining leave of court to

defend the divorce action, procured an order bringing in as additional defendants two individuals who were then in possession, and claimed title by virtue of a recent deed to them, of certain real estate which had been the community property of the plaintiff and the defendant. The guardian thereafter filed a second amended answer in the action, denying the material allegations of the complaint and, by way of further answer, setting up as against the plaintiff a cause of action for divorce from her and for nullification of the alleged property settlement, and also a cause of action as against the additional defendants for cancellation of the deed held by them and for restoration of the property to the defendant. The additional defendants filed a reply denying the allegations of that answer in so far as it applied to them and alleging affirmatively that they had purchased the real property in due course, for value, and without notice of any claim thereto by the principal defendant. Upon the issues thus framed, the cause proceeded to trial before the court without a jury.

The trial court made findings of fact from which it concluded that the prayer of plaintiff's complaint should be denied and that defendant instead should be awarded a decree of divorce; that the alleged property settlement should be set aside and the entire community property divided as then directed by the trial court; that the deed above referred to should be canceled and the real property therein described be awarded to the defendant as his separate property; and that the additional defendants should be repaid the sum of fifteen hundred dollars, which was the amount they had originally paid for the purchase of the property. A decree was entered accordingly. Plaintiff has not appealed from any portion of the decree. The additional defendants alone have appealed, but only from that portion of the decree canceling the deed and ousting them from the property in question.

As may be inferred, the case has some very peculiar and unusual features, and it may be stated in the beginning that

none of the attorneys appearing upon this appeal had any connection with the case until after the trial in the superior court. The evidence with reference to the issue concerning the deed sought to be set aside is virtually without dispute. Furthermore, the facts relating to the alleged reciprocal causes of action for divorce are not important here except as they bear upon the transaction with reference to the deed. We shall hereinafter refer to the respective parties by name or else, at times, to Ariel Barth, who has not appealed, simply as plaintiff; to the defendant Frank J. Barth as respondent; and to the additional defendants A. M. Medalen and Margaret M. Medalen, husband and wife, as appellants.

The plaintiff and the respondent intermarried in June, 1932 or 1933. Respondent had been married before and had a son who at the time of the second marriage was about six years of age. There is no child of this second union. Sometime after their marriage, the plaintiff and respondent acquired the real property involved in this action, located at 514 north 75th street, in the city of Seattle, and described as lot 24 and the west twenty feet of lot 25, block 17 of Hillman's Lake Front No. 2 Addition to that city. Upon this property the parties established their home.

The plaintiff and respondent lived together as husband and wife until June 1, 1942, at which time their community property consisted of household furnishings and furniture, a 1941 Chevrolet automobile, nine or ten United States war bonds having a maturity value of fifty dollars each, a savings account amounting to about fifty dollars, and an equity of about fifteen hundred dollars in the real property above described which allegedly was worth about fifty-five hundred dollars, but was subject to a mortgage of approximately thirty-nine hundred dollars, held by a savings and loan association in Seattle.

The husband and wife and the young boy lived together fairly amicably until about a year before the commencement of this action. In that year, however, there were frequent quarrels between the spouses, the causes for which were disputed upon the trial. At any rate, by June 1, 1942,

matters had come to such a state that the respondent concluded to get a divorce.

Mr. J. Lael Simmons, of the law firm of Simmons & McCann, had been the attorney for Mr. Barth for many years prior to the latter's second marriage; he had also represented both Mr. and Mrs. Barth in various lawsuits since their marriage.

On June 1st, respondent consulted Mr. Simmons with reference to obtaining a divorce from the plaintiff. In that interview, the respondent told the attorney that he and his wife had been having a good deal of trouble, fighting and quarreling with each other, and that he had given his wife a beating the Saturday night before. After some further discussion, Mr. Simmons concluded that the respondent did not have satisfactory grounds for a divorce and so advised his client. At the same time, Mr. Simmons suggested: "Well, if it doesn't make any difference to you, why don't you let her get the divorce," to which respondent replied: "Well, that would be fine. Call her up." Upon the understanding that he would act as the attorney for Mrs. Barth in such action, Mr. Simmons at once got in touch with her by telephone and requested her to come to his office, which she did on the following day.

In the interview between Mr. Simmons and the respondent on June 1st, they also discussed the matter of a proposed property settlement, and thereupon Mr. Simmons on the same day prepared such an agreement, which in terms provided that plaintiff should "receive the house and household furniture and furnishings," except respondent's personal effects and keepsakes, "the house to be otherwise left intact and possession delivered within 15 days"; that respondent should receive as his absolute property "nine or ten defense bonds owned by the parties," together with the 1941 Chevrolet sedan; that each party should "execute such instruments as might be necessary to carry out this agreement"; and that the plaintiff should pay the unpaid balance owing on "the stove and furniture" and the respondent should pay "the

unpaid balance on the car." The final paragraph of the proposed agreement reads:

"The parties own no other property and desire this agreement *to be approved by the court in the above entitled cause*; the plaintiff to pay costs of the divorce action." (Italics ours.)

During that same interview between the respondent and Mr. Simmons, respondent signed a blank form of statutory quitclaim deed, and there is some evidence that Mr. Simmons signed his name thereto as notary. The instrument as thus executed contained nothing, however, except the usual printed provisions with the addition of the date, the signature of the respondent, and the signature of J. Lael Simmons at the end of the notarial certificate.

It is conceded that the respondent did not sign the property settlement agreement at the time of the interview on June 1st, for the reason that he wanted the plaintiff to sign it first; in fact, the agreement is dated June *2nd*.

On June 2nd, plaintiff went to the office of Mr. Simmons as she had been requested to do and, after some discussion, signed and verified her complaint in this action. At the same time, she also signed the property settlement agreement. Mr. Simmons then called the respondent by telephone and said to him: "Well, I have got her to sign all right," and respondent replied: "All right; I will be right down." Respondent then went to Mr. Simmons' office on June 2nd and, in the absence of the plaintiff, signed the property settlement agreement. At the same time, the complaint was served upon respondent, and service thereof was acknowledged by him on the summons.

It appears from the evidence that for several weeks prior to June 1st respondent had been on the verge of nervous prostration. He was extremely irritable, fidgety, and upset, and at times talked irrationally. One of the witnesses testified that he had been informed by Mrs. Barth that this condition had been coming on for four or five months but had grown more acute during the three or four weeks immediately preceding June 1st. It also appears that, either on June

2nd or June 3rd, Mr. Simmons had called a psychiatrist and arranged for an examination of the respondent's mental condition. At any rate, respondent was taken to the Harborview hospital on June 3rd, and on the morning of June 4th was examined by the insanity commission. Mrs. Barth, Mr. Simmons, and Mrs. Rose Clark, respondent's sister, were present on that occasion. Pursuant to the examination by the insanity commission, respondent was adjudged insane and on June 5th was committed to the Western State Hospital for care and treatment.

On June 9th, plaintiff's complaint for divorce was served upon the prosecuting attorney for King county and the original copy was filed in the clerk's office. Thereafter, Rose Clark, sister of the defendant, commenced a proceeding in which she asked that she be appointed as the guardian of the person and estate of the respondent. A hearing was had on that petition on July 28th, and on that day Mrs. Clark was appointed as such guardian. The property settlement agreement above mentioned was not filed until October 19, 1942, the day of trial of the present action.

In the meantime, the transaction which led to this appeal took place. On Thursday, July 23, 1942, appellants A. M. Medalen and Margaret M. Medalen, coming from North Dakota, arrived in Seattle and immediately began a search for a place in which to live. In the afternoon of the following day, they visited some relatives who told them that a house across the street was for sale. This was the property involved in the present action. A "For Sale" sign was in the window. Mrs. Medalen visited the premises, saw Mrs. Barth, went through the house, and discussed terms of sale and purchase. Mrs. Barth explained that the property was in the hands of a real estate agent who would have charge of it until the following Monday and that the agent was asking $5,700 for the place; that she would require a down payment of $700; and that the purchaser was to assume an existing mortgage which, according to a passbook then shown to Mrs. Medalen, amounted to approximately $3,900. Mrs. Barth also told Mrs. Medalen at that time that she

and Mr. Barth were getting a divorce, that the house was hers, and that she was selling it, but she made no mention of the facts concerning Mr. Barth's commitment to the hospital for the insane. It is not disputed that the Medalens knew nothing of the circumstances connected with the property settlement agreement or with the defendant's commitment, nor did they make any investigation or inquiry with reference to those matters.

Mrs. Medalen was pleased with the house, and had her husband immediately come over to look at the place, but she stated to Mrs. Barth that she was not at all interested in purchasing through a real estate dealer.

On the following Monday, July 27th, about noon, the Medalens again visited the property. The real estate agent's listing had expired at that time. After a short discussion, the parties arrived at an understanding according to which the Medalens were to pay Mrs. Barth $1,500 cash for her equity in the property and assume the outstanding mortgage; Mrs. Barth was to furnish title insurance.

The Medalens then procured a cashier's check for $1,500 and, with Mrs. Barth, drove downtown to the building where Mr. Simmons' office was located. The two ladies went up to the office, while Mr. Medalen remained in the automobile. The conference with Mr. Simmons lasted from about twenty to forty-five minutes. Mr. Simmons still had in his possession the property settlement agreement which had been signed by both the plaintiff and the respondent on June 2nd, although at different hours, and also had in his possession the blank statutory quitclaim deed which the respondent had signed and acknowledged on June 1st.

Mrs. Medalen saw the deed and noted its incomplete condition. Mr. Simmons thereupon instructed his secretary to fill in the blank spaces in the instrument. The secretary then typed in the names of both the respondent *and the plaintiff* as grantors, the names of the appellants as grantees, a consideration of "Ten Dollars and other valuable consideration," and the legal description of the property. In the certificate of acknowledgment the secretary typed the names

of Frank J. Barth and Ariel V. Barth and the date as the "1st day of June, 1942." Plaintiff then signed the deed underneath the signature of the respondent and acknowledged it before Mr. Simmons *as of June 1st, 1942.* All this was done on July 27th, in the presence of Mrs. Medalen, who testified as follows upon the subject:

"Q. When you got upstairs will you state whether or not this deed was then filled in with names and dates and figures and amounts? A. This deed had one name on it and it had a date on it and it was filled in after that, but it already had one name and one date on it. Q. I will ask you whether or not Mrs. Barth signed that in your presence? A. Yes; she did. Q. And that was on what date? A. *July 27th.* Q. And at that time Mr. Simmons notarized this deed, did he? A. Yes; I think everything was taken care of at that time. Q. That was on *July 27th?* Are you correct on that? A. Yes. Q. You noticed that this deed said that it is notarized by Frank and Ariel Barth personally appearing before Mr. Simmons on *June 1st,* 1942. Didn't you question that? A. No; I didn't. His name was there and she supplied her name and he [Simmons] told me that if we made the deal, unless it was made right he wouldn't do it, and that was enough for me." (Italics ours.)

Mrs. Medalen then endorsed the fifteen hundred dollar check and handed it to Mr. Simmons who in turn delivered the deed to Mrs. Medalen. As a part of the same transaction Mr. Simmons gave the plaintiff his check for $100; he also gave Mrs. Medalen his two checks, one for $32 to cover the July mortgage installment, and one for $3.15 to cover the amount of the revenue stamps; and stated that he would retain the balance of the $1,500 until the policy of title insurance was delivered. No such policy has ever been issued.

On the next day, July 28, 1942, Mrs. Medalen went to the auditor's office where the necessary revenue stamps were attached to the deed, and at 3:42 p. m. of that day she filed the instrument for record. On Thursday, July 30th, the Medalens took possession of the property and, so far as the record shows, have resided there ever since. After taking possession, they spent several hundred dollars making improvements consisting principally of remodeling the base-

ment into an apartment, which they rent to three war workers. On the same day that the deed was filed for record, Mrs. Clark, the guardian, procured and filed an *ex parte* order of the superior court permitting her to answer plaintiff's complaint for divorce, and on August 3rd she obtained and filed a similar order making the appellants herein additional parties defendant.

During all this time, the respondent was still in the Western State Hospital under commitment. By August, however, he had improved considerably, and on the twelfth day of that month he was paroled into the custody of his sister and guardian, Rose Clark.

On September 15, 1942, respondent served upon Simmons & McCann the second amended answer above mentioned. Simmons & McCann, as attorneys for the *appellants,* served and filed a reply. At the trial, which was held October 19, 1942, both the plaintiff and the appellants herein were represented by Mr. Simmons, and the respondent was represented by Mr. Pierce, of the law firm of Henry, Henry & Pierce. Respondent was personally present at the trial and Mr. Simmons endeavored to call him as a witness, but the court would not permit him to do so, for the reason that the witness was still under commitment for insanity. It appears, however, that during the nine weeks' interim between his release from the hospital and the day of the trial respondent had spent considerable time in getting evidence against the plaintiff.

At the conclusion of the evidence as set forth above, the trial court took the entire cause under advisement, but, on October 24, 1942, the judge wrote to the respective attorneys for the various parties and informed them that a further hearing would be had on October 26th, and also instructed respondent's attorneys to subpoena the physicians who had examined the respondent at the insanity hearing. Upon resumption of the trial, the judge himself conducted the examination of Dr. D. A. Nicholson, who testified as follows:

"A. From his [respondent's] condition on the 4th [of June] we felt that that condition had been present for a number of months if not some years. The history given as to when this trouble began was six years ago, but it had been continuing off and on during that period. Q. And could you say from the examination that you made that day, or will you be able to say, what his condition was on the 1st day of June and on the 2nd day of June of that same year? A. I would say the man was insane. Q. You would? A. Yes. Now that does not mean but what there would be periods when he could attend to business, and attend to his work. Q. I am particularly concerned about the first and 2nd of June from his condition as you saw it on the 4th day of June? A. I could only testify as I have stated. . . . There wasn't any question about the man's mental condition."

No objection to the court's examination of the witness was made by either counsel nor did either of them interrogate the doctor. The court then further interrograted Mr. Simmons as a witness, and drew from him a statement of the circumstances under which he instituted the divorce action. In one of his answers, Mr. Simmons stated:

"Now this man Barth at that time knew everything that was going on. He may have had some imaginations."

Upon the oral argument at the conclusion of all the testimony, the trial court stated that plaintiff's application for divorce would be denied and that the property settlement and deed would be set aside. The trial judge further indicated at that time that he was not ruling upon the respondent's prayer for divorce, whereupon both counsel joined in a motion to grant the respondent such decree. A few days thereafter, the court made findings of fact from which it was concluded and decreed that respondent should be awarded a divorce; that the property settlement and deed should be set aside; that the respondent should be awarded the automobile, the home, and the furniture therein, except a certain portion thereof awarded to the plaintiff; that plaintiff should be awarded eleven war bonds of the denomination of fifty dollars each and cash theretofore received by her amounting to approximately $350; and that the re-

spondent through his guardian should pay to Mr. Simmons the sum of $504.50 to be used with the money still in his possession for the reimbursement of the appellants to the extent of $1500 paid by them for the real property. No appeal was taken by either the plaintiff or the respondent from the decree awarding the divorce or as to the property distribution adjudged by the trial court. The questions upon this appeal relate solely to the validity of the deed executed and delivered to the appellants under the circumstances narrated above.

■ Rem. Rev. Stat., § 10550 [P. C. § 1908-21], provides that every conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed. Rem. Rev. Stat., § 10551 [P. C. § 1908-22], prescribes, as the requisites of a deed, that it shall be in writing, signed by the party bound thereby, and acknowledged by such party before some person authorized to take acknowledgments. These sections of the statute merely state the general requirements of a deed, but do not cover the matter of the authority of one other than the grantor to fill blank spaces left in such instrument.

■ A number of states have adopted the rule that an authority subsequently to insert the grantee's name in a deed must be in writing. In this state, however, we have followed what we think is the more reasonable rule, that a deed in which the name of the grantee is left blank but which is otherwise lawfully executed will vest title in a person whose name is subsequently inserted therein as grantee by one having authority from the grantor so to do, and that in the absence of any fraud such authority may ordinarily be inferred from the fact of possession of the deed by the person who fills in such blank. *Clemmons v. McGeer,* 63 Wash. 446, 115 Pac. 1081; *Wright v. Heyting,* 118 Wash. 436, 203 Pac. 935; *Ball v. Kauffman,* 196 Wash. 517, 83 P. (2d) 746. See, also, 16 Am. Jur. 485, Deeds, § 82; notes (1924) 32 A. L. R. 737; (1931) 75 A. L. R. 1108; Ann.

Cas. 1912A, 540; Ann. Cas. 1914D, 391; 4 Tiffany, Real Property (3d ed.) 36, § 969.

Although it may be questionable, under the peculiar situation involved here, whether Mr. Simmons had implied authority to fill in any other name than that of the plaintiff as grantee, we will assume for the purposes of this case that, if the deed were otherwise lawfully executed, his authority would have permitted him to fill in not only the name of the plaintiff as one of the *grantors,* but also the names of the appellants as grantees. We indulge this assumption merely because of the more serious question presented by the fact that the deed here involved, when delivered to Mr. Simmons, was merely what may be termed a "blank deed" having simply the signatures of the respondent and Mr. Simmons at the customary places in the printed form. To have the matter clearly before us, we here reproduce the contents of the deed as of that time:

"Statutory Quit Claim Deed

"THE GRANTOR ...........................................................................................
for and in consideration of.................................................................Dollars
($.................................) convey and quit claim to.............................
all interest in the following described real estate, situated in
the County of........................... State of Washington: .......................:

"Dated this 1st day of June A. D. 1942.

FRANK J. BARTH    (Seal)<br>...................................................... (Seal)

"STATE OF WASHINGTON ⎫
   County of King     ⎬ ss
                    ⎭

"On this day personally appeared before me.................................
.................................. to me known to be the individual described in
and who executed the within and foregoing instrument and
acknowledged that...........................signed the same as............................
free and voluntary act and deed, for the uses and purposes
therein mentioned.

"GIVEN under my hand and official seal this.......................day
of..................................         J. LAEL SIMMONS
Notary Public in and for the State<br>of Washington, residing at......................."

It will be noted that the instrument as above set forth does not state the name of any grantor or grantee, ex-

presses no consideration, and is utterly wanting in description; also that the acknowledgment is incomplete. It is undisputed that respondent never saw the instrument except in the condition set forth above. In fact, at the time it was filled in by Mr. Simmons, respondent was, and for nearly two months had been, in the insane asylum.

██ It is the well nigh universal rule that in order to be valid as a conveyance a deed must either contain such a description of the land to be conveyed as that it can be properly and clearly identified, or else must contain a reference to another instrument which does include a sufficient description. Stated otherwise, a deed executed in blank is void, for the reason that it lacks a subject matter upon which it can operate. *George v. Manhattan Land & Fruit Co.*, 51 F. (2d) 28; *Saulsberry v. Saulsberry* (C. C. A.), 121 F. (2d) 318; *Boyd Lbr. Co. v. Mills*, 146 Ga. 794, 92 S. E. 534, L.R.A. 1918A, 1154; *Gould v. Gould*, 194 Ga. 132, 21 S. E. (2d) 64; *Weber v. Adler*, 311 Ill. 547, 143 N. E. 95; *Wilson v. Johnson*, 145 Ind. 40, 38 N. E. 38, 43 N. E. 930; *McBride v. Steinweden*, 72 Kan. 508, 83 Pac. 822; *Barras v. Barras*, 191 Mich. 473, 158 N. W. 192; *Samuel v. Frederick*, 262 S. W. (Mo.) 713; *Kea v. Robeson*, 40 N. C. 373; *Utah State Bldg. & Loan Ass'n v. Perkins*, 53 Utah 474, 173 Pac. 950; 26 C. J. S. 210, Deeds, § 29; 16 Am. Jur. 584, Deeds, § 260; 4 Tiffany, Real Property (3d ed.) 89, § 990; 8 Thompson, Real Property (Perm. ed.) 2, § 4225.

This court has followed the general rule that a deed must contain a description of the property to be conveyed sufficient to identify it. In *Morsbach v. Thurston County*, 152 Wash. 562, 278 Pac. 686, we said:

"The granting clause must also include the property conveyed, so that it may be identified."

In the recent case of *Martinson v. Cruikshank*, 3 Wn. (2d) 565, 101 P. (2d) 604, we made this statement:

"In a long line of decisions, we have held that, in order to comply with the statute of frauds, a contract or *deed for the conveyance of land* must contain a description of the

land sufficiently definite to locate it without recourse to oral testimony. [Citing cases.]" (Italics ours.)

We therefore hold that the alleged deed, as delivered by the respondent to Mr. Simmons, was void or, more accurately speaking, was not a valid deed, because of its total lack of subject matter on which it could operate.

There is no contention in this case that the instrument as subsequently altered was ratified by the respondent. There can be no such contention, for, admittedly, when the blanks were filled in eight weeks later respondent had been adjudged insane and was confined in the Western State Hospital; and, since his release, his every act, personally or through his guardian, has been in disavowal of the deed.

The next question to be considered is whether Mr. Simmons had any authority from the respondent to fill in the deed. There is no claim that he had written authority to do so, and conceding, for the purpose of the argument, that parol authority would be sufficient, we find in the record no evidence that he had even such authority. Mr. Simmons did not testify that the respondent orally instructed him to fill in the description. He might have testified to that effect had he been permitted to state fully what the respondent had said to him in their interview on June 1st. When he endeavored to go into that subject, however, respondent's counsel objected on the ground that it was a privileged communication between an attorney and his client. The court sustained the objection and, we think, rightly so. When respondent sought the advice of Mr. Simmons on June 1st, the day the deed was first signed, a relationship of attorney and client was created between them, and the attorney could not thereafter reveal, over the objection of his client, what had been communicated to him in that interview.

There can be no implication of authority to fill in a description of the property from the mere fact of Mr. Simmons' possession of the deed signed in blank by the respondent. Filling in a description stands upon an entirely different footing from that of filling in the name of a grantee

in a deed otherwise lawfully executed. In the latter instance, the grantor has fully indicated his intention to divest himself of his title to certain definitely described property, and the filling in of the name of the grantee may be said to be but the fulfillment of that intention; in the former instance no such intention is indicated nor can it be inferred.

Furthermore, it is apparent from the record that the finality and validity of the deed in question, as between the spouses, were dependent upon its approval by the court. Certainly, the parties could not have intended that the instrument should have any greater validity if used in an altered form to convey title to a third party unknown to the grantor husband at the time. The deed has, of course, never been approved; to the contrary, it has been set aside by the very tribunal to whom it was submitted for adjudication. We conclude, therefore, that Mr. Simmons had no authority to fill in the description. Much less, then, would he have authority to fill in the entire instrument and thus give it the appearance and effect of a valid deed.

The next question for consideration is whether, despite the invalidity of the deed, the respondent is now estopped to deny its effectiveness. Appellants put forward the contention that they are bona fide purchasers of the property, and that therefore respondent is precluded from attacking the deed.

A "bona fide" purchaser of real property is one who purchases such property for a valuable consideration, in good faith, and without notice, actual or constructive, of outstanding rights or claims of other persons. The particular element of that definition as applied to this case is the question of notice. We are therefore called upon to decide whether, under the facts of this case, appellants had notice, actual or constructive, of any outstanding right or claim on the part of the respondent with respect to the land in question.

We have already declared that the so-called statutory quitclaim deed was void upon its face at the time that

it was first exhibited to Mrs. Medalen. She was thoroughly familiar with its physical condition at that time, and knew that it contained neither the names of parties nor description of property. In short, the instrument spoke its invalidity as loudly as any instrument could. It gave her actual notice that it was not a valid deed. True, she may not have known its legal effect or lack of legal effect, nor have been aware that under the law Mr. Simmons had no authority to fill in the blank portions of the instrument. Ignorance of the law, however, will not excuse her, for the security of titles cannot be made to rest upon such unstable support.

Aside from what has just been said, however, the entire train of circumstances connected with the transaction in which Mrs. Medalen participated was such as to put her, as a reasonably prudent person, upon notice that she could not safely deal with Mrs. Barth at that time. Although Mrs. Barth had told her that the property was hers, Mrs. Medalen was also advised that the parties were getting a divorce. The only conclusions that she could have drawn from the information given her were either that Mrs. Barth had a deed to the property in her own name or else that the property was one of the subjects of the divorce action. She was further informed that title insurance *would be* given. She dealt with the attorney for only one of the parties. She saw the incompleteness of the deed. Had she consulted the public records or had she engaged an attorney to make an investigation, she would have discovered that the validity of the deed, even as delivered to her, required a confirmation by the court. She would also, in all likelihood, have learned upon inquiry that the respondent was in an insane asylum where he had been confined continuously since the second day after he had signed the blank deed. Had she waited until a policy of title insurance was issued, these same facts would have been brought to her attention. No attorney representing her interests would have permitted her, under the circumstances, to part with her money until he had become satisfied that respondent had the mental

capacity, as well as the will and purpose, to execute and deliver a proper deed to the property. She did not even take the time or trouble to ascertain whether the property which she examined conformed to the description typewritten into the deed, or whether in fact the Barths themselves, as a community, held the title thereto, or whether there were any incumbrances against it other than the outstanding mortgage. She appeared content to take, at best, simply a quitclaim deed, without knowing what it conveyed to her. This combination of circumstances, in our opinion, composed and furnished a warning clue, which, if pursued, would have fully enlightened her upon the subject and would have enabled her to protect herself against loss or embarrassment in the transaction.

We hold, therefore, that respondent is not estopped to deny the invalidity of the deed.

■■ Appellants' final contention is that the trial court erred in merely offsetting the value of the improvements made by them against the rental value of the property, and in failing to allow them interest on the amount paid by them in the purchase thereof.

There was no evidence of either the monetary value of the improvements or the rental value of the property. In the absence of any such proof, there was nothing else that the trial court could do in that respect. The effect of the court's ruling was to disallow appellants anything for the improvements and to disallow respondent anything for rent, upon the theory that neither party had proved a case upon those respective issues.

With regard to interest upon the purchase price, two things may be said: (1) Respondent got no benefit from the payment of the purchase price by the appellants to Mr. Simmons and (2) the money is, in a sense, still in escrow in the hands of Mr. Simmons and is therefore as much under the control of the appellants as it is under the control of either the plaintiff or the respondent. The situation bears no resemblance to those cases where a vendor, having had the use and benefit of the purchase price of property con-

veyed by him, thereafter rescinds the sale, and for that reason must restore the money together with interest thereon.

In so far as this appeal is concerned, the decree is affirmed.

SIMPSON, C. J., BEALS, JEFFERS, and GRADY, JJ., concur.

[1]Reported in 143 P. (2d) 554.