[No. 30275. Department One. October 9, 1947.]

HOWARD A. LEO, *Appellant,* v. W. C. CASSELMAN *et al.,*
*Respondents.*[1]

*J. Peter P. Healy,* for appellant.

*Metzler, McCormick & Metzler,* for respondents.

SIMPSON, J.—This action was instituted for the purpose of recovering a commission for the sale of real estate and some personal property. The cause, tried to the court, resulted in a judgment favorable to the defendants.

In presenting his appeal, appellant assigns error on the part of the trial court in holding that the agreement was within the statute of frauds, in dismissing plaintiff's complaint, in refusing to grant plaintiff judgment on the agreement, and in refusing to grant judgment for a commission on at least two thousand dollars worth of personal property.

The evidence produced at the trial may be summarized as follows: During July, 1946, respondents were the owners of a home, store, and gasoline filling station at 96th and Waller road, Pierce county. The real property was of the value of $13,500, and the stock was worth between two and three thousand dollars.

[1]Reported in 185 P. (2d) 107.

July 30, 1946, appellant's salesman, Charles Nau, called on respondents and secured a signature to a written agreement, which reads as follows:

"In consideration of One 00/100 Dollar, and services to be rendered by the above Company, in endeavoring to effect a sale of the property hereinafter described, I hereby give and grant unto the said Company, the exclusive right to sell said property for a period of 30 days from this date.

"The sale price of said property is to be $13,500 plus stock, on the following terms:

"Cash   .  .  .

subject to any modification of the above terms accepted by me.

"DESCRIPTION Casselmans Service, 96 & Waller Road. Building Good Will Legal Disc. on back.

"I further agree in case a sale is effected, or a purchaser is found who is able, ready and willing to buy said property, to deliver to said purchaser through the said Company, a clear title to said property within a reasonable time after a sale shall be effected and to pay to the said Company, a commission of all above $13,500 NET  .  .  .  , or such amount as the said Company may procure over and above my net selling price, as and for their services upon consummation and closing of the deal.

"I further agree that in case any sale of said property is pending at the maturity of this agreement, that the same shall be extended to consummate said sale; and if any person first shown said property by the said Company, shall subsequently buy from me direct within 180 days from the date hereof, I agree to pay the said Company a commission of 10%-per cent of the gross selling price forthwith upon such sale.

"Accepted by:

"NORTH COAST REALTY          W. C. Casselman
"By Chas. Nau                                        Owner
                                        Ferne E. Casselman."

On the following day, Mr. Nau secured the legal description from the county treasurer's office and endorsed it on the back of the listing contract.

Appellant's evidence shows that within two weeks he found a man who desired to purchase the property in accordance with the terms set out in the contract entered into

between himself and respondents. However, the property had been sold to another individual.

Relative to the legal description, we find the testimony to be as follows:

"A. Well, when I [Charles Nau] obtained the listing I did not get the legal description. I took the listing, and Mr. Casselman was all ready to go to town, so I wrote the listing out on the hood of the car, he left in the car, and Mrs. Casselman had gone over to a neighbor, and when she came back, after waiting two and a half hours she came back and signed it. I asked for the tax statement to get the legal description of the property, and she said that she did not have it, and she said that Mr. Casselman would give it to me the next day.

"And I went back the next day for the legal description and Mr. Casselman looked for it, and said that he could not find it and he said, well, that I could get it down where I worked, for the Tacoma Realty Company, and I told him that I was not with the Tacoma Realty Company any more, that I was with Mr. Leo and that I could get the thing at the court house.

"So I came up to the court house and copied it off up there at the Treasurer's office and put it on the back of the listing, and took the listing over and turned it in to Mr. Leo, my broker.

"Q. And you knew at that time, and Mr. Casselman knew at that time that the legal description had to be contained in the listing, didn't you? A. Yes, sir. Q. And you told him that you didn't have it? A. Yes, and he certainly told me to go and get it. Q. You asked him to sign the listing, and you told him that you would return later and put the legal description in? A. Yes, sir. Q. Now, did you ever go back out there again to show him that it was in? A. Yes, sir. On July 31st I went back out there. Q. On July 31st? A. Yes, sir. Q. Who was present when you went back out? A. Mr. Casselman and Mrs. Casselman, and his daughter."

W. C. Casselman testified:

"Q. And did you talk to Mr. Nau about that tax receipt when you signed the listing? A. He [Mr. Nau] wanted me to look up the description of the real estate, also the personal equipment, and I told him that I didn't have time that night. Q. Did you tell him that he could get it from some previous listing? A. Well, if he was in his old office he could have, yes. Q. Just answer the question. Did you tell him that he could get it from some previous listing? A. I suppose I did.

I don't remember. Q. What? A. I don't remember. Q. You may have said that? A. I may have said that. . . .

"Q. Mr. Casselman, did you read that listing before you signed it? A. I did. Q. Was the language, 'Legal description on back' there before you signed it? A. No, sir, it was not. . . .

"Q. You did have some conversation with Mr. Nau about the description? A. I did. Q. Did you tell him that he could get it from a previous listing? A. No, I did not. Q. What? A. He could have there. Q. I am asking you, did you tell him? A. I asked him if he had a previous listing, and where he could dig this up, and he said, 'No,' the books were all closed and locked up, and the Real Estate Commission, I think that he said, had them under lock and key, and he could not get at them. Q. Did you tell him that he could get the legal description from a previous listing? A. No. Q. You didn't tell him that? A. No. I asked him if he had the previous listing. Q. And you knew that the description was not written out on the back? A. I did. Q. And you signed it? A. That is right. Q. But you delivered it to him anyway and asked him if he had the description from a previous listing? A. He told me that he would come back and get it. Q. You do not answer my question. If you will pay attention to my questions we will get along faster. You knew that the legal description was not on the paper when you signed it? A. That is right. Q. And you say that you asked him if he had the description from a previous listing? A. I did. Q. The purpose of your asking him that question was so that he could put the description on there, was it not? A. If he wanted it right away, yes."

A disinterested witness, who was present when the agreement was signed, stated:

"Q. Now, just tell the Court what conversation was had concerning this listing? A. Well, Mr. Nau asked Mr. Casselman to give him the listing. And Mr. Casselman told him that he was in a big hurry, and he didn't want to take the time then. So Mr. Nau told Mr. Casselman that if he would put his signature on it he would come back later and get the description and get Mrs. Casselman's signature."

The court found that the listing did not contain a legal description of the premises, and that appellant did not find a purchaser who was willing, able, and ready to purchase the property.

Appellant contends that parol authority "to fill in the description of the real property exists, where such authority is reasonably implied, or actually given," and cites several authorities, among which are: 16 Am. Jur. 584; *Chicago Title & Trust Co. v. O'Marr*, 18 Mont. 568, 46 Pac. 809; *Barth v. Barth*, 19 Wn. (2d) 543, 143 P. (2d) 542.

In *Grammer v. Skagit Valley Lbr. Co.*, 162 Wash. 677, 299 Pac. 376, this court held that in a contract between an owner and the broker for the sale of real estate, it was necessary that the real property be described with particularity. Accord: *Martinson v. Cruikshank*, 3 Wn. (2d) 565, 101 P. (2d) 604.

Conceding, for the purpose of argument, that the authorities cited by appellant state the law, we do not find that any definite authority was given to appellant's agent to complete the instrument by placing on its back page a particular description of the land. The statements made by respondents did not amount to the giving of authority to complete the instrument by placing thereon a legal description of the real property. The most that respondents agreed to, was that appellant's agent could secure a description of the land if he wanted to put it on the listing agreement "right away."

The contract entered into between respondents and appellant was void because it did not comply with the statute of frauds by setting out a description of the real property which was the subject of the listing agreement.

The judgment of the trial court was correct and is therefore affirmed.

MALLERY, C. J., MILLARD, SCHWELLENBACH, and HILL, JJ., concur.